**UNITED STATES DISTICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MARISSA FAIRCHILD | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:23-CV-467-HAB |
| | ) | |
| ASHELY-HUDSON POLICE DEPARTMENT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This case arises from a police chase resulting in the death of a fourteen-year-old boy, Jaden Donovan James Bowman ("Jaden"). Plaintiff—Jaden's mother, Marissa Fairchild—has filed suit against Defendants Officer Shane Richards, the Ashley-Hudson Police Department, and the Town of Ashley (the "Ashley Defendants"), as well as Officer Chase Pfefferkorn and the Steuben County Sheriff's Department (the "Steuben Defendants"). Plaintiff asserts Constitutional claims pursuant to 42 U.S.C § 1983 as well as a state-law claim brought under the Indiana Tort Claims Act, Ind. Code § 34-13-3-1, *et seq*.

Before the Court are two Motions for Summary Judgment, one filed by the Ashley Defendants (ECF No. 49) and one filed by the Steuben Defendants (ECF No. 55). The motions are fully briefed and ripe for consideration. (ECF Nos. 50-51, 56-57, 59-60, 69-74).

## I. BACKGROUND[1]

This lawsuit arises out of a series of events that unfolded on April 19, 2023. Ashley Defs. SOMF ¶¶ 1-3 (ECF No. 51). That morning, police contacted the Plaintiff and asked her to bring Jaden into the Waterloo Police Department to discuss footage the police had of Jaden—who was on probation after a prior incident—trespassing inside a body shop with his friends the week before. *Id.* ¶¶ 6, 8-9. When Jaden and his mother went to the police station, an officer told Jaden they would be reporting his trespassing to the probation department. *Id.* ¶ 9.

Later that evening, after his mother had gone to bed, Jaden left the house. *Id.* ¶¶ 10-13. At some point after leaving the house, Jaden began operating a stolen van—a van that had been left by the side of its owner's house with the keys inside. *Id.* ¶¶ 15, 17-18. Jaden's operation of the stolen vehicle coincided with Defendant Officer Richards's shift. *Id.* ¶ 21. Richards is a police officer who has been employed by the Ashley-Hudson Police Department since 2014. *Id.* ¶ 19.

According to Richards's deposition testimony, during his shift, he observed the van parked partially in the grass on the side of the road in front of a business, the owner of which had asked the police to keep an eye on the store, as it had been robbed before.[2] Richards Dep. at 131 (ECF No. 51 at 115-160). As he watched the store, the van began moving. *Id.* at 132. When he noticed

---

[1] Citations for the facts in this section are primarily from the Statements of Material Facts filed by both sets of Defendants. Where any facts are disputed, the Court notes the dispute.

[2] In her response to the Ashley Defendants' Statement of Material Facts, Plaintiff acknowledges that Richards made these statements in his deposition, but states that there is no evidence to confirm that the van was in front of a business that had been robbed before. (ECF No. 60 at 5). The Court notes—as do the Ashley Defendants in their response to Plaintiff's objections—that sworn deposition testimony from a party is admissible, and absent any evidence to the contrary, should be treated as uncontradicted. *See* Fed. R. Civ. P. 56(c). In other words, Plaintiff may not effectively dispute statements made by a Defendant simply by stating there is no corroborating evidence—she must instead provide contradicting evidence of her own.

the vehicle "going left of center" and running a stop sign, Richards turned on his emergency lights and attempted to perform a traffic stop.[3] *Id.* at 132-33; Ashley Defs. SOMF ¶ 31.

The driver did not stop, instead accelerating through another stop sign. Ashley Defs. SOMF ¶ 31. In response, Richards turned his siren on and began pursuing the van. *Id.* ¶ 32. The driver continued to accelerate, speeding east out of town. *Id.* ¶ 33. As he continued to pursue the van, Richards radioed the situation to the Steuben County Dispatch and notified the Ashley Town Marshal. *Id.* ¶ 34. Defendant Deputy Chase Pfefferkorn, an officer with the Steuben County Sheriff's Department, heard Richards's call regarding the pursuit. Steuben Def. SOMF ¶ 41. He proceeded to Richards's location to assist. *Id.* ¶ 42.

At one point during the pursuit, the van entered the Hamilton Fish and Game Club, stopping briefly in the parking lot. Ashley Defs. SOMF ¶ 39. Richards testified that he assumed the driver was stopping. *Id.* ¶ 41. Instead, the driver backed up and exited the Club, driving past Richards as he did so. *Id.* ¶ 42. The driver then continued westward at speeds of up to 90 miles per hour. *Id.* ¶ 44.

---

[3] In addition to the traffic infractions, Richards testified in his deposition that he decided to attempt a traffic stop of the vehicle because he thought—because of the location and type of vehicle—that the driver of the van could be a man named Tyson Mcilvain, who was the subject of an outstanding warrant for parole violation. Ashley Def. SOMF ¶¶ 26-30.

In her response to the Ashley Defendants' Statement of Material Facts, Plaintiff acknowledges that Richards stated during his deposition that he had previously seen Mcilvain in this kind of van and that the pursuit began near Mcilvain's home, but objected on the grounds that Richards also testified that the only reasons he attempted a traffic stop were that the van drove "left of center" and rolled through a stop sign. (ECF No. 60 at 6). During Richards's deposition, in a discussion on the "left of center and then disregarding the stop sign" observations, Richards was asked whether there were "any other reasons why [he] felt like there was an immediate need for apprehension." Richards Dep. at 141 (ECF No. 60-2). He responded: "I think those cover it right now." *Id.* However, Richards testified during that same discussion that there was also a need for immediate apprehension because the driver "might be ... the parole absconder, Tyson." *Id.* at 139. This leads the court to conclude that Richards intended to testify that both the driving infractions and the possibility that the driver was Tyson Mcilvain contributed to his assessment that there was an immediate need for apprehension.

Pfefferkorn heard Richards radio that they had turned around at the Fish and Game Club and were headed back westbound on 800 South. *Id.* ¶ 45. Pfefferkorn testified that he decided to put out "Stop Sticks," a tire deflation device, in an attempt to slow the driver down. *Id.* ¶ 46; Pfefferkorn Dep. at 39. He testified that he found what he believed was a safe spot to deploy them. *Id*. After Pfefferkorn radioed to dispatch that he would try to deploy stop sticks, Richards asked whether anyone was in the area who could deploy stop sticks.[4] Ashley Defs. SOMF ¶ 47.

Richards radioed a description of the van. Stueben Defs. SOMF ¶ 52. When Pfefferkorn saw the van approaching, with Richards's lights following behind and no other vehicles around, he pulled the stop sticks into the westbound lane and positioned himself behind his vehicle. *Id.* ¶¶ 53-56. Pfefferkorn testified that the van approached the stop sticks and went partially off the north side of the road—maybe in attempt to avoid the sticks—but that he heard a noise and saw the sticks move, leading him to believe the sticks had punctured a tire. *Id.* ¶¶ 57-59. Pfefferkorn radioed dispatch that he got a "good stick." *Id.* ¶ 61.

The pursuit continued. *Id.* ¶ 62; Ashley Defs. SOMF ¶ 53. About two miles from where the stop sticks were deployed, the vehicle left the roadway, turning north into a field, where it eventually struck a tree. Stueben Defs. SOMF ¶ 63. Jaden died in the resulting explosion. *Id.* ¶ 64.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a

[4] As Plaintiff points out, it is unclear whether Pfefferkorn decided to set up the tire-deflation device before or after hearing Richards request that assistance. *See* ECF 74 at 2. The Court finds the answer to this question to be immaterial.

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## III. ANALYSIS

Plaintiff brings both federal and state claims. The Court will address her federal claims first before turning to the state claims.

### A. Federal Claims

Plaintiff brings her federal claims under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of [law] ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." She alleges that Defendants violated Jaden's constitutional rights under the Fourth and Fourteenth Amendments. The Fourth

Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourteenth Amendment requires that the states not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

**1. Fourth Amendment**

Plaintiff brings Fourth Amendment claims against Richards, the Ashley-Hudson Police Department, and Pfefferkorn. She brings her Fourteenth Amendment claims against Richards and the Ashley-Hudson Police Department only.[5] The Court will first consider the claims against the individual defendants before turning to the claims against the Ashley-Hudson Police Department.

**a. Individual Defendants**

As an initial matter, as government officials, Richards and Pfefferkorn assert that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Doe v. Gray*, 75 F.4th 710, 716 (7th Cir. 2023) (quoting *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017)). Courts assess claims of qualified immunity under a two-part test. *Kemp*, 877 F.3d at 350. The plaintiff bears the burden of showing that (1) a statutory or constitutional right was violated, and (2) that right was clearly established at the time of the relevant conduct. *Id.* While qualified immunity is a question of law for the court, *see Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021), the facts at this stage must be viewed in the light most favorable to Plaintiff, *see Leiser v. Kloth*,

[5] In her Second Amended Complaint, Plaintiff lists Richards, the Ashley-Hudson Police Department, the Town of Ashley, Pfefferkorn, and the Steuben County Sheriff's Office as Defendants to Fourth and Fourteenth Amendment claims. (ECF No. 27). In her response brief to the Steuben Defendants' Motion for Summary Judgment, however, Plaintiff voluntarily dismisses her Fourteenth Amendment claim against Pfefferkorn, and voluntarily dismisses both her Fourteenth and Fourth Amendment claims against the Steuben County Sheriff's Office. (ECF No. 69 at 2).

933 F.3d 696, 700 (7th Cir. 2019) (considering whether "the defendants were entitled to qualified immunity when viewing the facts in the light most favorable to . . . the non-moving party").

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The threshold consideration in a Fourth Amendment inquiry is whether the governmental conduct in question constitutes a search or seizure within the meaning of the amendment's text." *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003). If the Court determines a seizure did occur, it must then consider whether that seizure was "reasonable" under the Fourth Amendment. *Id.* at 510-11.

Because both sets of Defendants argue that no seizure occurred, the Court will first consider that question before addressing whether that seizure was reasonable.

**i. Seizure**

The Supreme Court has explained that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (internal quotation marks omitted) (emphasis in original). Where there is solely "a governmentally caused termination of an individual's freedom of movement (the innocent passerby) [or] . . . a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon)," there is no seizure. *Id.* (emphasis in original). The Seventh Circuit, in interpreting *Lewis*, has "emphasized the distinction between 'an accidental or tortious act which happens to be committed by a governmental official and an intentional detention that gives rise to the level of a constitutional violation.'" *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003) (quoting *Campbell v. White*, 916 F.2d 421, 422-23 (7th Cir. 1990)).

Both sets of Defendants begin their motions by arguing that no seizure occurred here. The Ashley Defendants rely heavily on the Seventh Circuit's opinion in *Steen v. Myers*, 486 F.3d 1017 (7th Cir. 2007), which addressed Fourth and Fourteenth Amendment claims brought after a police chase resulted in a motorcyclist's death. In affirming the district court's grant of summary judgment on the Fourth Amendment claim, the court explained that because, "[i]n the context of a police pursuit, a Fourth Amendment seizure does not occur unless an officer intentionally and forcibly halts the fleeing suspect," the plaintiff needed to demonstrate both "that the officer forcibly stopped the vehicle and that the contact was intentional" in order to survive summary judgment. *Id.* at 1021-22. Because the plaintiff failed to bring forth evidence that there was any contact between the motorcycle and the police car, the *Steen* plaintiff failed to demonstrate that a seizure had occurred.

The Ashley Defendants argue that, pursuant to *Steen*, Plaintiff has failed to meet her burden of proof on her Fourth Amendment claim, as she has not demonstrated that Richards forcibly stopped the vehicle, let alone that any forcible stop was intentional. (ECF No. 50 at 6-8). According to the dash cam video, Richards made no contact with Jaden or the van. (*Id.* at 8).

In response, Plaintiff argues that, because Richards was "the lead officer" on the pursuit and "clearly and repeatedly radioed for other police officers to put out Stop Sticks"—a call which resulted in Pfefferkorn's ultimate deployment of the stop sticks—he "seized" Jaden for Fourth Amendment purposes. (ECF No. 59 at 13-14). Plaintiff adds that Richards's failure to "blockade the one-lane bridge at the conservation club or pin the white van in the parking lot" also contributed to his role in seizing Jaden. (*Id.* at 14). "But for" Richards's actions, Plaintiff argues, Jaden's tires would not have deflated, and he would not have hit the tree. (*Id.*).

There are two problems with Plaintiff's argument. The first is that—as the Ashley Defendants point out—Plaintiff "cites no legal authority for the proposition that an officer can be held constitutionally liable for the actions of another officer from a different police department over whom he had no authority or control." (ECF No. 71 at 4). Plaintiff has not established that Richards had any supervisory control over Pfefferkorn—they do not even belong to the same law enforcement units—and even if she had, she has cited no cases stating that the primary officer on a pursuit is responsible for the actions of other officers in connection with that pursuit.

The second problem is that Plaintiff offers no legal authority to support the theory that the fact that Jaden's seizure may not have occurred "but for" Officer Richards's actions means he should be held responsible for that ultimate seizure. She cites the Seventh Circuit's opinion in *Cooper v. Carl A. Nelson and Company*, 211 F.3d 1008, 1015 (7th Cir. 2000) for the proposition that "[w]hether the breach of a duty proximately caused an injury is a question of fact for a jury." (ECF No. 59 at 14). But she fails to connect the question of proximate cause with a determination of whether a seizure has occurred under the Fourth Amendment. The Court, therefore, finds that Plaintiff has not established that Richards "seized" Jaden under the Fourth Amendment.

Further, even if there had been a seizure, Richards would be protected by qualified immunity which, as explained above, "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). While a case directly on point is not required for a Court to find a right to be clearly established, "existing precedent must have place the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Plaintiff has the burden to demonstrate that the right claimed to have been violated was clearly established. *See Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021). She has not provided any case law to indicate that a police officer involved in a pursuit who radios a message asking others to deploy stop sticks but does not deploy stop sticks or otherwise come into contact with the plaintiff has violated a clearly established right.

In arguing that Pfefferkorn, too, did not seize Jaden, the Steuben Defendants cite *Marion v. City of Corydon*, 2008 WL 763211 (S.D. Ind. Mar. 20, 2008), in which a different District Court in this Circuit granted summary judgment on a Fourth Amendment claim premised on an injury caused during a police chase. *See* ECF No. 56 at 10. In *Marion*, while the pursuing officers used stop sticks in the course of the pursuit, the plaintiff did not "acquiesce or submit to police powers" until he was shot and immobilized later in the chase. 2008 WL 763211, at *6. In other words, because the stop sticks failed to actually stop the plaintiff, their use did not amount to a seizure. *Id.* The Steuben Defendants argue that the situation before us is analogous, as Jaden continued to travel for over two miles after the stop sticks were deployed and did not stop until he lost control of the vehicle. (ECF No. 56 at 10-11).

The Court does not find this argument persuasive. In *Marion*, the deployment of the stop sticks was not ultimately effective—which led the court to find no seizure occurred. The Court finds the Seventh Circuit's opinion in *Bublitz v. Cottey*, 327 F.3d 485 (7th Cir. 2003), more instructive here. In *Bublitz*, an officer deployed a tire spike system against one car, which had the ultimate consequence of stopping a different car—belonging to the plaintiffs. The plaintiffs argued that this was a seizure of their car, but the Seventh Circuit disagreed, explaining that, because plaintiffs' family was "simply not the intended object of the defendant officers' attempts to seize

the fleeing" vehicle, there was no seizure for purposes of the Fourth Amendment. The Court reads *Bublitz* to mean that a spike system that stops its intended target can be considered a seizure.

The stop sticks deployed by Pfefferkorn punctured at least one of the tires on the van Jaden was driving, which was one of the two main causes of the crash, according to the Indiana State Police accident reconstructionist and Plaintiff's expert. *See* ISP Report at 37-38 (ECF No 51 at 102-03); Wilcox Report at 4, 6, 18 (ECF No. 60-7). That the tire deflation took two miles to result in Jaden's stop makes no difference to the Court's finding that there was "governmental termination of freedom of movement through means intentionally applied." *See Lewis*, 523 U.S. at 844. The Court is satisfied that Plaintiff has demonstrated that a seizure existed.

**ii. Reasonable**

Because the Court has established that Jaden was seized, it must now determine whether that seizure was reasonable. *See Bublitz*, 327 F.3d at 488 ("The Fourth Amendment prohibits the governmental seizure of a person unless that seizure is reasonable."). "The reasonableness standard is objective, judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (internal quotation marks omitted). The Court can consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The analysis must be conducted in consideration of the fact that officers often need to make "split-second judgments based on rapidly developing events." *Howell v. Smith*, 853 F.3d 892, 989 (7th Cir. 2017).

The question of reasonableness must also be considered in the context of the qualified immunity analysis, which the Court has explained above. The relevant inquiry when evaluating a

claim of qualified immunity is into "whether the violative nature of particular conduct is clearly established.," *al-Kidd*, 563 U.S. at 742. "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (internal quotation marks omitted).

Both Plaintiff and the Steuben Defendants discuss the Supreme Court's opinion in *Scott v. Harris*, 550 U.S. 372 (2007), which addressed Fourth Amendment claims brought by a plaintiff who had incurred serious injury after a police officer terminated a high-speed pursuit of the plaintiff's car by applying his push bumper to the rear of the vehicle, causing the plaintiff to lose control of the vehicle and crash. *Id.* at 375. The Supreme Court held that the officer's actions were reasonable, and that he was therefore entitled to summary judgment. *Id.* at 385-36. In so ruling, the Court noted the relative culpability of the plaintiff, who had intentionally engaged in a high-speed flight for over 10 miles, ignoring police warnings to stop. The Court also provided the following guidance regarding Fourth Amendment claims arising out of police pursuits:

> [W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness. Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

*Id*. at 385-86.

Plaintiff attempts to distinguish the situation at hand from that in *Scott*, arguing that here "there was no imminent danger to the public" and characterizing the pursuit as "a lonely chase on a straight rural road with almost no other civilians nearby." (ECF No. 59 at 15-16). She adds that

"no known crime . . . occurred prior to the chase" and that the deployment of stop sticks was "contraindicated by weather, speed and terrain." (*Id.*)

The Steuben Defendants, on the other hand, argue that Jaden did pose an "actual and imminent threat to public safety." (ECF No. 56 at 12). Similar to the plaintiff in *Scott*, Jaden was resisting arrest by fleeing from the officers at high speeds—at some times traveling in excess of 90 m.p.h.—and had continued flight for eleven minutes with no indication that he might stop. The Steuben Defendants argue that the deployment of stop sticks represented a "measured" response to the threat, as compared to other potential tactics sometimes used to bring fleeing cars to a stop, such as ramming the vehicle, as happened in *Scott.* (*Id.* at 13).

The Court agrees with the Steuben Defendants that *Scott* counsels toward a finding that Pfefferkorn's decision to deploy the stop sticks was reasonable. The speed at which Jaden was traveling, combined with the length of the pursuit and his failure to stop for stop signs, leads the Court to find that there was an actual and imminent threat to public safety. The fact that the pursuit occurred on a "straight rural road with almost no other civilians nearby" does not negate the danger it posed to anyone who may have been driving that rural road. *See Mullenix*, 577 U.S. at 15 (finding that qualified immunity protected an officer who used deadly force from a Fourth Amendment claim while noting that traffic was "light" on the road used for the pursuit—and specifically stating that the plaintiff did not pass as many cars as had the drivers in *Scott*).

Plaintiff, in additional support for her contention that the use of stop sticks here was unreasonable, notes that "expert testimony, ILEA training materials[6], and the "'Stop Sticks'

[6] Plaintiff includes a discussion of a Law Enforcement Training Board Policy on vehicle pursuits in the section of her brief dedicated to why the Court should find Pfefferkorn violated the Fourth Amendment, contending that Pfefferkorn violated various Policy "factors." *See* ECF No. 69 at 9-10. But Plaintiff fails to explain how these policies are relevant to the question of whether Defendants have an effective qualified immunity defense against her Constitutional Claims. Plaintiff herself cites the Seventh Circuit's opinion in *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) for its statement that, "if compliance with

product manual itself, warn that tire deflation makes it hard to control a vehicle at high speeds." (ECF No. 59 at 14). "This danger is compounded by uneven pavement, loose gravel, and wet conditions, all of which existed the night of Richards' pursuit." (*Id.*). She argues that the Court should not grant summary judgment here because expert testimony regarding techniques used by police officers in the field would help the jury to determine whether Pfefferkorn's decision to deploy the stop sticks was reasonable, in light of the circumstances that existed during the pursuit.

Plaintiff cites the Seventh Circuit's opinion in *United States v. Brown*, 871 F.3d 532 (2017) to support this argument. In *Brown*, the Seventh Circuit affirmed the exclusion of expert testimony concerning police policy, explaining that such testimony is only relevant to the Fourth Amendment objective reasonableness inquiry under special circumstances, such as when "something peculiar about law enforcement (*e.g.*, the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact." *Id.* at 538 (internal quotation marks omitted). Plaintiff argues that such testimony is necessary here.

The Court finds Plaintiff's citation to *Brown* unpersuasive, as it concludes that Pfefferkorn is protected from liability under the doctrine of qualified immunity, and "[e]ven if an officer acts contrary to [his]training . . . that does not itself negate qualified immunity where it would otherwise be warranted." *City & Cnty. Of San Francisco v. Sheehan*, 575 U.S. 600, 616-17 (2015) (explaining that, "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless") (internal quotation marks omitted).

---

departmental policy were the applicable legal standard, the police department itself would become the arbiter of Fourth Amendment reasonableness—a prospect that would have horrified those responsible for the Amendment's ratification." *See* ECF 69 at 16.

The "relevant inquiry" when determining whether qualified immunity applies is "whether existing precedent placed the conclusion that [Pfefferkorn] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix* 577 U.S. at 13-14 (quoting *al-Kidd*, 563 U.S. at 741). The situation Pfefferkorn faced here is similar to the situation faced by the police officer in *Scott*, who the Supreme Court found to be behaving reasonably. In *Mullenix*, another case involving a Fourth Amendment claim brought after an officer used deadly force during a high-speed pursuit, the Supreme Court stated that "[t]he Court has . . . never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 14. Considering the precedent set by *Scott* and *Mullenix*—and Plaintiff's failure to either point to a closely analogous case finding the alleged violation unlawful—the Court cannot say that existing precedent has placed the conclusion that Pfefferkorn acted unreasonably in these circumstances "beyond debate." *Mullenix*, 577 U.S. at 13-14.

The Court finds that Pfefferkorn is entitled to qualified immunity on Plaintiff's Fourth Amendment Claim. The Court, therefore, grants summary judgment in favor of Richards and Pfefferkorn on Plaintiff's Fourth Amendment claim.

**b. Municipal Defendants**

In Count II of her Second Amended Complaint, Plaintiff names Richards, the Town of Ashley[7], and the Ashley-Hudson Police Department as Defendants to her Fourth Amendment claim. As an initial matter, Indiana's statutory scheme does not confer on municipal police departments the capacity to sue or be sued. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 300

[7] The Second Amended Complaint lists "Town of Hudson" instead of "Town of Ashley" under Count II. (ECF No. 27 at 4). Because "Town of Hudson" appears nowhere else in the Complaint, in the case caption, or in the briefs filed in response to either of the relevant Motions for Summary Judgment, the Court assumes that "Hudson" was written instead of "Ashley" in error.

(7th Cir. 2011). Accordingly, all claims against the Ashley-Hudson Police Department are dismissed.

This leaves Plaintiff's claims against the Town of Ashley. The Town of Ashley may be held liable under Section 1983 only as outlined in the Supreme Court's opinion in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

In her response to the Ashley Defendants' motion, Plaintiff appears to abandon her Fourth Amendment claim against any municipal defendants, claiming only that the Ashley-Hudson Police Department "violated Jaden's substantive due process rights by failing to properly train Richards prior to the pursuit of April 19, 2023." (ECF No. 59 at 18).

Regardless, the Court grants summary judgment in favor of the Town of Ashley on Plaintiff's Fourth Amendment claim. Because Plaintiff failed to establish that Richards "seized" Jaden within the meaning of the Fourth Amendment, she failed to establish that he violated the Fourth Amendment. And because Richards did not violate Jaden's Fourth Amendment Rights, there can be no liability under § 1983 for Ashley on a failure to train theory under *Monell*. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T[here can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.").

**2. Fourteenth Amendment**

The Fourteenth Amendment requires that the states not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. As the Seventh Circuit explained in *Steen*, "the *sine qua non* [for Fourteenth Amendment liability] . . . is a purpose to cause harm." 486 F.3d at 1023. In the context of police pursuits, the Supreme Court has held "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983."

*Lewis*, 523 U.S. at 849. A plaintiff has a "heavy burden . . . to bear when making a § 1983 claim based on the Fourteenth Amendment"—namely, to demonstrate that the conduct in question "rise[s] to the level of shocking the conscience." *Steen*, 486 F.3d at 1022.

Plaintiff brings Fourteenth Amendment claims against both Richards and the Town of Ashley. Regarding Richards, Plaintiff argues that his decisions to continue pursuing Jaden for eleven minutes and six seconds—including at very high speeds, at some points—, and to call for the deployment of stop sticks, rise to the level of "conscience-shocking" behavior that violates the Fourteenth Amendment.

In support of this argument, Plaintiff attempts to distinguish a set of cases in which courts in this Circuit found that a police pursuit did *not* violate the Fourteenth Amendment. (*See* ECF No. 59 at 17-18). In each of those cases, the pursuit was shorter than the one at issue here, and the court found no Fourteenth Amendment violation.[8] She argues that the length of the pursuit is a "crucial element" in a court's determination of whether a substantive due process claim may be allowed, and notes that Richards pursued Jaden for eleven minutes and six seconds, at various speeds—"double or more the length of the longest pursuits" in the cases she distinguishes. Her theory is that this "extensive amount of time gave Richards ample opportunity to consider his options," and that he should have terminated the pursuit instead of continuing and requesting stop sticks. (ECF No. 59 at 18). The "length of the chase," she argues, "tells us that Richards intended to catch the suspect at any cost, even if that meant harming him." Plaintiff contends that there must be some

[8] In *Steen*, the Seventh Circuit found no Fourteenth Amendment violation where the chase was six minutes, with no contact. *See* 486 F.3d at 1019-20. In *Lewis*, the Supreme Court found no violation where the chase lasted only 75 seconds. 523 U.S. at 837. In *Winston v. City of Chicago*, the U.S. District Court for the Northern District of Illinois found no violation where the chase covered only two blocks at a speed of 50-70 m.p.h. 130 F. Supp. 3d 1218 (N.D. Ill. 2015). And in *Smith v. Ciesielski*, the U.S. District Court for the Southern District of Indiana found no violation where the chase was only three minutes, at speeds of 80 m.p.h. 975 F. Supp. 2d 930 (S.D. Ind. 2013).

maximum amount of time after which a pursuit "shocks the conscience"—and that the determination as to what that length of time might be should be left to a jury. (*Id.* at 18).

The Court disagrees. As the Seventh Circuit concluded in *Steen*, "[t]he Supreme Court has set the bar awfully high in pursuing a Fourteenth Amendment claim that arises out of a police chase." 486 F.3d at 1025. The Court agrees with the reasoning the U.S. District Court for the Western District of Pennsylvania applied when it rejected a similar argument and reasoned that "*Lewis* did not indicate that in a high speed pursuit case to meet the 'shocks the conscience' standard the degree of culpability would be determined on a case by case basis by clocking the minutes of the pursuit and might at times require only deliberate indifference or reckless disregard on the part of the pursuing officer or others involved in pursuit decision-making." *Koreny v. Smith*, 2018 WL 1141513, at *6 (W.D. Penn. Mar. 2, 2018).

The question is not how long the pursuit lasted, but rather whether the plaintiff has demonstrated the defendant's intent to harm. The Court finds that the eleven-minute length of this chase is insufficient to rise to that "awfully high bar," set by the Supreme Court in *Lewis*, absent additional evidence that Richards intended to harm Jaden—additional evidence that the Court does not find in this record. Even assuming that Plaintiff's view of the significance of the length of the pursuit is the correct one, and that Richards had adequate time to deliberate on the use of stop sticks, the Court cannot find that his decision to radio for stop sticks "shocks the conscience." During that chase, Richards had to weigh the risks posed to Jaden of stop stick deployment against the risks posed to the public of a continued, high-speed chase. Radioing for stop sticks during an eleven-minute pursuit of a fleeing target who is driving at high speeds and not observing traffic signs such as stop signs cannot be considered "conscience-shocking" behavior.

There is no doubt that the result of this police pursuit was tragic—and it is possible that there may have been other, better, courses of action that Richards could have taken that would have avoided this tragedy. "But mistakes of judgment, even those that result in tragedy, do not give rise to liability under § 1983." *Winston*, 130 F. Supp. 3d at 1225. At most, Plaintiff raises questions as to whether Richards was reckless—or even deliberately indifferent—in his decision to radio for stop stick deployment. But questions as to whether Richards was "negligent, reckless, or even deliberately indifferent" do not factor into the Court's evaluation of a Fourteenth Amendment claim but are rather "reserved to the state courts and the law of tort." *Steen*, 486 F.3d at 1025. Under the correct standard, which "requires conscience-shocking behavior and an intent to cause harm unrelated to a legitimate government interest," *id.*, the Court finds that Richards did not violate the Fourteenth Amendment and is entitled to summary judgment on this claim.

Regarding the municipal Defendants, Plaintiff argues that "the Ashley-Hudson Police Department violated Jaden's substantive due process rights by failing to properly train Richards prior to the pursuit."[9] (ECF No. 59 at 18). But, as explained above, "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Because the Court finds no Fourteenth Amendment violation, the Court grants summary judgment in favor of the Town of Ashley on this claim as well.

**B. State Claims**

For the reasons stated above, the Court grants Defendants' summary judgment motions as to the claims under 42 U.S.C. § 1983. Because that disposition results in the dismissal of all claims over which the Court has original jurisdiction, see 28 U.S.C. § 1367(c)(3), the Court must address

[9] Because the Ashley-Hudson Police Department is not a proper defendant, *see supra* Section III.A.1.b, the Court construes this argument as applying to Plaintiff's *Monell* claims against the Town of Ashley.

whether to retain jurisdiction over the state law claims for battery and negligent supervision and rule on Defendants' motions for summary judgment.

As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims"); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits.").

Because the Court grants summary judgment in favor of Defendants with respect to all of Plaintiff's federal claims, it dismisses Plaintiff's state-law claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment (ECF Nos. 49, 55) are GRANTED in part and DENIED in part. Judgment is hereby entered in favor of all Defendants on the claims arising under 42 U.S.C. § 1983 in Plaintiff's Second Amended Complaint. Defendants' Motions are denied as to Plaintiff's state law claims; those claims are dismissed without prejudice to refiling in state court.

SO ORDERED on September 10, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT